# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT BONKOWSKI and ALEX MERKEL, individually and on behalf of all other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WALMART INC., a Delaware corporation,<br><br>Defendant. | No. 2:25-cv-01462-DSF-PVC<br><br>Order GRANTING Defendant WALMART INC.'S Motion to Compel Arbitration (Dkt. 9) |

    Defendant Walmart Inc. moves to compel arbitration and stay these proceedings pending individual arbitration of claims brought by Plaintiffs Robert Bonkowski and Alex Merkel.  Dkt. 9 (Mot.).  Plaintiffs oppose.  Dkt. 17 (Opp'n).  The Court deems this matter appropriate for decision without oral argument.  See Fed. R. Civ. P. 78; Local Rule 7-15.  For the reasons stated below, the motion is GRANTED.

## I. Background

    Walmart, the largest retailer in the United States, offers items for sale in physical stores and on the internet.  Dkt. 9-2 (Krsulic Decl.) ¶ 2.  Customers who wish to do their shopping online may place orders either through a web browser or through Walmart's mobile application.  Id.  Regardless of the online platform, a customer must complete one of

two processes to make an online purchase: a "Checkout Process" or a "Buy Now Process." Dkt. 9-1 (Agrawal Decl.) ¶ 2.

The Checkout Process features a blue button that reads "Place order for" followed by the total price of the item(s), including any applicable shipping fees and taxes. Id. ¶¶ 3-5. Directly beneath that button is language that reads "By placing this order, you agree to our Privacy Policy and Terms of Use." Id. The phrases "Privacy Policy" and "Terms of Use" appear underlined and in grey text, and hyperlink to the full text of those policies. Id. The Buy Now Process is nearly identical, with the only difference being that the blue button reads only "Place order" and the acknowledgment language appears directly above the button. Id. ¶¶ 3-4, 6. Every time a customer places an online order with Walmart, whether through a web browser or mobile application, she must click a Place Order button that is immediately adjacent to a hyperlink to Walmart's Privacy Policy and Terms of Use. Id. ¶¶ 7-8.

On August 5, 2024, Bonkowski and Merkel purchased products from Walmart on Walmart.com. Id. ¶¶ 13-14. Bonkowski and Merkel could not have completed their respective transactions without clicking a Place Order button that was adjacent to a hyperlink to Walmart's Terms of Use according to the processes described above. Id. ¶ 15.

At all relevant times, the following text was featured at the top of Walmart's Terms of Use:

> IMPORTANT: THESE TERMS OF USE CONTAIN A MANDATORY ARBITRATION PROVISION THAT, AS FURTHER SET FORTH IN SECTION 20 BELOW, REQUIRES THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES. THIS MEANS THAT YOU AND THE WALMART ENTITIES ARE EACH GIVING UP THE RIGHT TO SUE EACH OTHER IN COURT OR IN CLASS ACTIONS OF ANY KIND. IN ARBITRATION, THERE IS NO JUDGE OR JURY AND THERE IS LESS DISCOVERY AND APPELLATE REVIEW THAN IN COURT.

Krsulic Decl. ¶ 3.

Section 20 states: "ALL DISPUTES ARISING OUT OF OR RELATED TO THESE TERMS OF USE OR ANY ASPECT OF THE RELATIONSHIP BETWEEN YOU AND WALMART . . . WILL BE RESOLVED THROUGH FINAL AND BINDING ARBITRATION." Id. ¶ 6. That section also provides that any required arbitration must take place on an individual basis, and be administered by the AAA pursuant to the current AAA Rules. Id. ¶¶ 7-8.

On January 17, 2025, Plaintiffs filed this putative class action against Walmart in California Superior Court, asserting claims for (1) violation of the California Invasion of Privacy Act, Cal. Penal Code § 631(a); (2) violation of the California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.10; and (3) invasion of privacy under California's Constitution. Dkt. 1-1 (Compl.). They seek to represent a class of California residents who "had their personally identifiable information or protected health information improperly disclosed to Facebook as a result of using walmart.com." Id. ¶ 46. On February 20, 2025, Walmart removed the action. Dkt. 1.

## II. Legal Standard[1]

"[T]he Federal Arbitration Act (FAA) makes agreements to arbitrate 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 336 (2011) (quoting 9 U.S.C. § 2). "By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985) (alteration in original); see also Lifescan, Inc. v. Premier Diabetic Servs., Inc., 363 F.3d 1010, 1012 (9th Cir. 2004) (If a valid arbitration agreement exists, "the court must order the parties to proceed to arbitration . . . in accordance with the

---

[1] The parties agree that the FAA controls here. See Mot. at 7-8; Opp'n at 5-6.

terms of their agreement."). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ." Ferguson v. Corinthian Colls., Inc., 733 F.3d 928, 938 (9th Cir. 2013) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)).

Generally, a court must determine two "gateway" issues when deciding whether to compel arbitration: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute. Brennan v. Opus Bank, 796 F.3d 1125, 1130 (9th Cir. 2015) (citing Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002)). But even these gateway issues can be submitted to an arbitrator where there is clear and unmistakable evidence that the parties intended that result. See id. (citing AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986)). "When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract." Henry Schein, Inc. v. Archer & White Sales, Inc., 586 U.S. 63, 65 (2019).

### III. Discussion

Walmart moves to compel arbitration on the grounds that Plaintiffs executed an enforceable arbitration agreement that covers their claims. Mot. at 8. Walmart argues that the "arbitration provision delegates all 'gateway' questions of enforceability and scope to the arbitrator," and, even if the Court reaches those threshold issues, it should compel arbitration. Id.

#### A.   Existence of an Arbitration Agreement

Walmart argues that Plaintiffs manifested their assent to be bound by the Terms, and the arbitration provision, when they made their online purchases by clicking the Place Order button on Walmart's website. Mot. at 9. Plaintiffs counter that their clicking of the Place Order button cannot be construed as manifesting their assent to the Terms because the checkout process did not provide "explicit notice"

4

that the act of clicking the button would have the legal effect of binding them to the Terms.  Opp'n at 8.

"As the party seeking to compel arbitration, [Walmart] bears 'the burden of proving the existence of an agreement to arbitrate.'"  Norcia v. Samsung Telecomm's Am., LLC, 845 F.3d 1279, 1283 (9th Cir. 2017) (quoting Knutson v. Sirius XM Radio Inc., 771 F.3d 559, 565 (9th Cir. 2014)).  "In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation."  Chabolla v. ClassPass Inc., 129 F.4th 1147, 1154 (9th Cir. 2025) (quoting Oberstein v. Live Nation Ent., Inc., 60 F.4th 505, 511 (9th Cir. 2023)).[2]  Under California law, for a contract to be formed "there must be actual or constructive notice of the agreement and the parties must manifest mutual assent."  Id. (quoting Oberstein, 60 F.4th at 512-13).  Assent may be manifested through a party's conduct if the party both "intend[s] the conduct and know[s], or has reason to know, that the other party may infer her assent from the conduct."  Id.

The Ninth Circuit has described four types of assent mechanisms used in the context of internet contracts: browsewrap, clickwrap, scrollwrap, and sign-in wrap agreements.  See id.  On one end of the spectrum are browsewrap agreements, where the user is considered to have accepted the website's terms of use merely by browsing the site, even if those terms are not immediately apparent on the screen.  Id.  "Courts consistently decline to enforce browsewraps."  Id.  On the opposite end of the spectrum are scrollwrap agreements, where the website requires the user to scroll through all the terms before clicking a box to agree.  Id.  Scrollwraps "provide[ ] 'the strongest notice' and are usually enforced . . . ."  Id.

The assent mechanism Walmart used here, providing a link to the Terms and indicating that clicking the Place Order button will bind the customer to the Terms but not requiring her to actually review the hyperlinked document, is known as a sign-in wrap agreement, and it "lives somewhere in the middle[.]"  Id.  "Like all online contracts, 'a

---

[2] The parties agree that California law applies here.  Mot. at 8; Opp'n at 7.

sign-in wrap agreement may be an enforceable contract based on inquiry notice if (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.'" Id. at 1154-55 (quoting Keebaugh v. Warner Bros. Ent. Inc., 100 F.4th 1005, 1014 (9th Cir. 2024)).

The Court finds that the Walmart checkout process provided reasonably conspicuous notice of the Terms because (1) the hyperlink was positioned directly above (or below) the Place Order button so that a reasonable customer would not complete an order without seeing it; (2) the phrase "Terms of Use" was underlined so as to make clear to the average internet user that the Terms were hyperlinked; and (3) the Terms included language in capitalized font at the top of the document alerting customers of the mandatory arbitration agreement, including the class waiver. See Agrawal Decl. ¶¶ 5-6; Krsulic Decl. ¶ 3; see also Rogolino v. Walmart, Inc., No. 2:24-cv-14308-AMC, 2025 WL 396453, at *3 (S.D. Fla. Feb. 4, 2025) (finding Walmart checkout process provides notice "conspicuous enough to put a reasonably prudent person on inquiry notice" based on positioning of hyperlink, underlined text, and capitalized content within the Terms). These design elements also distinguish Walmart's assent mechanism from those the Ninth Circuit found insufficient in Chabolla, where the notice was spread "across three separate pages and [the] manifestation of assent [was] constructed from three different action buttons[,]" and Berman, where "there were superfluous items separating the relevant action items from the notice." Chabolla, 129 F.4th at 1157-58 (citing Berman v. Freedom Fin. Network, LLC, 30 F.4th 849, 859-60 (9th Cir. 2022)).

The Court also finds that Plaintiffs unambiguously manifested assent by clicking the Place Order button because the acknowledgment language "explicitly advised that the act of clicking [would] constitute assent to the" Terms. Compare Agrawal Decl. ¶¶ 5-6 (notice explaining that "[b]y placing this order, you agree to our Privacy Policy and Terms of Use" with Place Order button to manifest assent), with Chabolla, 129

6

F.4th at 1167-68 (notice explaining that "[b]y signing up you agree to our Terms of Use and Privacy Policy" without "sign up" button).

Because Walmart's checkout processes provided reasonably conspicuous notice of the Terms containing an arbitration provision and Plaintiffs unambiguously manifested assent to the Terms when they clicked the Place Order button, the Court finds that the parties entered into an agreement to arbitrate.

## B.   The Delegation Provision

Walmart next argues that the parties agreed to delegate "all 'gateway' questions of scope and enforceability to the arbitrator" because the Terms incorporate the American Arbitration Association (AAA) Consumer Arbitration Rules, which provide that the arbitrator shall decide her own jurisdiction, including issues concerning the existence, scope, or validity of the arbitration agreement.  Mot. at 12-13.  According to Walmart, it is the arbitrator, not the Court, who must decide whether this dispute is within the scope of the Terms and whether those Terms are enforceable.  Id. at 13.  Plaintiffs argue that incorporation of the AAA rules is insufficient to delegate gateway issues to the arbitrator where, as here, the party opposing arbitration is not a sophisticated party.  Opp'n at 8-9.

"The delegation provision is an agreement to arbitrate threshold issues concerning the arbitration agreement." Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 68 (2010).  The Ninth Circuit has held that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." Brennan, 796 F.3d at 1130.  In Brennan, the Ninth Circuit noted that its holding was limited "to the facts of the present case, which [did] involve an arbitration agreement 'between sophisticated parties,'" but did not "foreclose the possibility that [the same] rule could also apply to unsophisticated parties or to consumer contracts[,]" specifically noting that "the vast majority of the circuits that [reach the same conclusion] do so without explicitly limiting that holding to sophisticated parties or to commercial contracts."  Id. at 1130-31.  The majority of district

7

courts have subsequently applied Brennan to consumer contracts. See, e.g., Willis v. Fitbit, Inc., No. 3:19-cv-01377-DMS-WVG, 2020 WL 417943, at *3 (S.D. Cal. Jan. 27, 2020); Kim v. Tinder, Inc., No. 2:18-cv-03093-JFW-AS, 2018 WL 6694923, at *3 (C.D. Cal. July 12, 2018) (same); Cordas v. Uber Techs., Inc., 228 F. Supp. 3d 985, 992 (N.D. Cal. 2017) (same); but see Aguilera v. Matco Tools Corp., No. 3:19-cv-01576-AJB-AHG, 2020 WL 1188142, at *6 (S.D. Cal. Mar. 12, 2020) ("But courts have held that whether this rule applies depends on whether the parties are sophisticated and understand the import of such an incorporation."). The Court finds the cases applying Brennan to consumer contracts persuasive. Because the arbitration agreement incorporates the AAA Rules, the Court finds that the parties agreed to delegate arbitrability.

Plaintiffs next argue the delegation clause is unconscionable and therefore unenforceable. Opp'n at 11-12. The Court must "resolve any challenge directed specifically to the enforceability of the delegation clause before compelling arbitration of any remaining gateway issues of arbitrability." Caremark, LLC v. Chickasaw Nation, 43 F.4th 1021, 1030 (9th Cir. 2022). As the party opposing arbitration, Plaintiffs bear the burden of proving unconscionability. Bielski v. Coinbase, Inc., 87 F.4th 1003, 1013 (9th Cir. 2023). To demonstrate that the delegation clause is unconscionable under California law, Plaintiffs must show both procedural and substantive unconscionability. Heckman v. Live Nation Ent., Inc., 120 F.4th 670, 681 (9th Cir. 2024).

In deciding whether the delegation provision is unconscionable, the Court's analysis is not limited "to the bare text of the clause." Id. at 680. Instead, the Court interprets the delegation clause "in the context of the agreement as a whole[,]" which may include considering whether "'unrelated' provisions make the delegation unconscionable." Id. at 680-81.

### 1. Procedural Unconscionability

"Under California law, procedural unconscionability addresses contract negotiation and formation and focuses on 'oppression or

8

surprise due to unequal bargaining power.'" Bielski, 87 F.4th at 1013 (quoting Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC, 55 Cal. 4th 223, 246 (2012)). "A court may find oppression where unequal bargaining power results in no real negotiation and an absence of meaningful choice, and surprise where the challenged term is hidden in a prolix printed form or is otherwise beyond the reasonable expectation of the weaker party[.]" Id. (internal citations and quotation marks omitted).

Plaintiffs argue that the delegation clause is procedurally unconscionable because the arbitration agreement provides that the AAA rules may be modified by the Terms and Walmart may change the Terms unilaterally "whenever it wants to by posting any revision to its own website." Opp'n at 12. According to Plaintiffs, "[t]his is highly unconscionable, especially in the context of an adhesion contract like the one at issue here." Id.

There can be no doubt that the delegation provision here was presented as an adhesion contract, giving Plaintiffs only two options: accept the delegation provision or forgo their Walmart purchases. See Bielski, 87 F.4th at 1014. Because "adhesion contracts always contain 'some degree of procedural unconscionability,' [Walmart's] delegation provision contains some level of procedural unconscionability." Id. (citation omitted). Still, although there was "no real negotiation" here, there also was no "absence of meaningful choice." Heckman, 120 F.4th at 682. The Court therefore finds the level of oppression relatively low because there is no evidence Walmart has achieved market dominance in the retail pharmacy industry such that consumers could "either use [Walmart's] website and accept its Terms, or refuse to use the website and be entirely foreclosed from purchasing [medication] on the primary market." Compare id. (explaining that, "with respect to oppression, '[i]t is hard to imagine a relationship with a greater power imbalance than between [Ticketmaster] and its consumers" because it has achieved market dominance and is now "the exclusive ticket seller for almost all live concerts in large venues"), with Compl. ¶ 8 (Plaintiffs bring claims related to their use of "walmart.com to access the Walmart pharmacy

9

page for various uses, including purchasing medications" and do not allege it has market dominance in the retail pharmacy industry).

Similarly, the provision permitting Walmart to update the Terms "from time to time by notifying [the customer] of such changes by any reasonable means, including by posting a revised Terms of Use through the Walmart Sites" does not establish a meaningful level of surprise on these facts. Krsulic Decl. ¶ 4. The Terms may permit Walmart to make unilateral revisions, but they also explicitly provide that any such changes do not apply retroactively. See id. And although the Terms allow Walmart to give customers notice of changes by posting any revisions to its website, Plaintiffs' dispute arises from their online purchases, so any revisions made to the Terms after they assented through the checkout process would not apply to their claims. Because the version of the Terms that Plaintiffs assented to is the same version that controls this dispute, the Court finds no surprise here.

Although there is some level of procedural unconscionability inherent in adhesion contracts, the Court finds that any procedural unconscionability in this contract is exceedingly low.

### 2. Substantive Unconscionability

The substantive unconscionability element concerns "the fairness of an agreement's actual terms" and "seeks to ensure that contracts, particularly contracts of adhesion, do not impose terms that are overly harsh, unduly oppressive, or unfairly one-sided." Bielski, 87 F.4th at 1014.

Plaintiffs argue that the delegation provision is substantively unconscionable because the arbitration agreement includes many overly harsh or one-sided terms, specifically (1) the mass action waiver; (2) the bellwether procedures; (3) the one-sided fee-shifting provision; and (4) the limitation on injunctive relief. Opp'n at 17-18.

The Court finds only the bellwether procedures relevant to the issue of whether the *delegation clause* is unconscionable. Although the Court's analysis is not limited to the text of the delegation clause, that

10

does not mean the Court can decide whether the *arbitration agreement itself* is unconscionable.  See Caremark, 43 F.4th at 1030.  As the Ninth Circuit has explained, the reason courts are not limited to a clause-bound interpretation is that unrelated provisions may give important context, without which "a court would be unable to consider the full meaning of the delegation provision."  Bielski, 87 F.4th at 1012.  Any "unrelated provisions" of the agreement then are properly considered *in relation* to the delegation clause.  See Heckman, 120 F.4th at 680-81 ("A party is . . . permitted under Rent-A-Center to challenge the enforceability of a delegation clause by explaining how 'unrelated' provisions make the delegation unconscionable.").  Plaintiffs fail to connect their arguments on the mass action waiver, fee-shifting provision, and limitation on injunctive relief to the delegation clause, and the Court finds that those provisions do not add any context that would make *the delegation provision* unconscionable.

As to the bellwether provision, Plaintiffs argue that Walmart's mirrors the one found substantively unconscionable by the Ninth Circuit in Heckman.  Opp'n at 17.  The Court disagrees.  The delegation clause at issue in Heckman was substantively unconscionable, in part, because of its unusual bellwether procedures:

> If the arbitrator in the bellwether cases holds that the delegation clause is valid, that holding is binding on the plaintiffs in all of the batched non-bellwether cases.  That is, the validity of the delegation clause in all cases is decided in bellwether cases, even though plaintiffs in the non-bellwether cases have no right to participate in the bellwether cases.  Indeed, plaintiffs in the non-bellwether cases will not even know the decision in the bellwether case as to the validity of the delegation clause until that decision is invoked against them.

Heckman, 120 F.4th at 684.

Unlike the bellwether provision in Heckman, which empowered the arbitrator to "unilaterally make a determination to group or batch

11

similar cases," which would then set precedent for later plaintiffs who had no opportunity to participate or opt out, <u>id.</u> at 678-79, the provision here groups or batches cases "(i) that involve common questions of law or fact and (ii) where the initiating parties are represented by the same law firm, the same group of coordinated law firms, or the same representative," and does not make those cases binding on subsequent non-grouped cases, <u>see</u> Dkt. 9-3 at 26.

At most, the bellwether provision may reflect a lack of mutuality, but "'the California Supreme Court has confirmed that a one-sided contract is not necessarily unconscionable,' [and] something more than the absence of mutuality is required for [a court] to find [a] provision unconscionable." <u>Bielski</u>, 87 F.4th at 1015 (quoting <u>Tompkins v. 23andMe, Inc.</u>, 840 F.3d 1016, 1030 (9th Cir. 2016)). The Court "do[es] not find any other conditions in the delegation provision that are overly harsh, unduly oppressive, or unfairly one-sided." <u>Id.</u> (cleaned up).

Because the delegation provision has, at most, low levels of procedural and substantive unconscionability, Plaintiffs have not met their burden of establishing that the provision is unconscionable. <u>See id.</u> at 1015. The Court finds that the delegation clause is enforceable, and all threshold arguments concerning scope or enforceability must be decided by the arbitrator. <u>Caremark</u>, 43 F.4th at 1030.

## IV. Conclusion

For the foregoing reasons, Walmart's Motion to Compel Arbitration is GRANTED, and the case is STAYED pending the outcome of the parties' arbitration. The clerk is ordered to administratively close this case. The Court orders that, within two weeks of the completion of arbitration, the parties must file a joint status report. If the arbitration is not completed by June 17, 2026, the parties must file a joint status report beginning on that date and continuing every four months until the arbitration is completed. Failure to file a required joint status report may result in the dismissal of this action without prejudice.

IT IS SO ORDERED.

Date: June 17, 2025

_____
The Honorable Dale S. Fischer
United States District Judge